505 A.2d 884

**Ann L. WALKER, et al.**

v.

**FIREMAN'S FUND INSURANCE COMPANY.**

**No. 774, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

March 11, 1986.

Richard C. Whiteford (Kenneth J. MacFadyen, Susan S. Miller and Patrick A. O'Doherty, on brief), Baltimore, for appellants.

Benson Everett Legg (John Henry Lewin, Jr. and Venable, Baetjer and Howard, on brief), Baltimore, for appellee.

Argued Before GARRITY, ALPERT and ROSALYN B. BELL, JJ.

GARRITY, Judge.

In the aftermath of a plane crash that took the lives of all five people aboard, we are asked to determine whether the Circuit Court for Baltimore City (Caplan, Hilary J.) properly granted a summary judgment motion denying liability coverage on behalf of appellees, Fireman's Fund Insurance Company. We shall focus our attention on the meaning of the phrase "aircraft chartered with crew" which pertains to the following aircraft exclusion clause contained in an excess liability policy which belonged to one of the individuals alleged to have been responsible for the accident:

*This insurance does not apply* ... to the ownership, maintenance, operation, use, loading or unloading of *any aircraft other than aircraft chartered with crew* by or on behalf of the insured. (Emphasis added).

## Facts

The history of this case takes us back to March 30, 1978, when six men flew to Nassau for a short vacation. They were Robert Altimus, Wayne Rairigh, Jack Rockman, Robert Lynn Walker, William Matthews and Donald Erlbeck. Rockman elected to extend his vacation and was not aboard when the light plane uncontrollably dove into the ocean surf while attempting a "buzzing" maneuver over a hotel soon after departing from Nassau International Airport on its return flight to Baltimore on April 3, 1978. All of the passengers perished on impact.

The airplane was a dual-control, six-seat, twin-engine Aero-Commander Aircraft owned by Phoenix Aviation, Inc.[1] The stockholders of Phoenix were Rockman, Walker, Erlbeck and Michael T. Volatile, all of whom were businessmen, most of whom had pilots' licenses. Since a portion of the journey would be over water, however, a pilot licensed for instrument flight would enhance safety. Volatile, who had an instrument-rated pilot's license, was scheduled to make the trip to Nassau but canceled for business reasons. Erlbeck then invited Matthews, another instrument-rated pilot, to take his place. Matthews did from time-to-time fly professionally, but this was not his primary occupation. He and Erlbeck were friends. As observed by Judge Caplan, "Matthews did not pilot the plane from Baltimore to Nassau; Erlbeck flew two of the legs and Walker flew one leg. Matthews was exempted from paying a share of the $40/hour flight fee, but did pay his share of all ground transportation, food, and lodging expenses."

---

1. The stockholders each paid $50/month for the upkeep of the plane, and there was a $40/hour charge for flight time. Occasionally, the plane was rented to non-shareholders at $90/hour flying time.

Although the flight plan listed Erlbeck as the pilot, at the crash site Matthews' body was found in the left-front command pilot seat of the aircraft. Erlbeck's body was positioned at the right-hand controls. Whether Erlbeck or Matthews was in control of the plane at the time of the crash remains undetermined. For purposes of the summary judgment, however, Fireman's Fund conceded Matthews to be the pilot.

In Phase One of this ligitation the estate of Walker, Rairigh, and Altimus sued the estates of Matthews and Erlbeck alleging that they were responsible for the accident. The suits were settled by an agreement under which each plaintiff obtained a consent judgment in the amount of $500,000 for a total of $1.5 million against the estates of Erlbeck and Matthews. Southeastern Aviation Underwriters, Inc. ("SEAU"), the airplane's liability insurer, paid a total of $300,000 in partial satisfaction of the judgments. In return, the appellants agreed not to collect the $1.2 million deficiency from the assets of the Erlbeck and Matthews estates but to look to the Personal Excess Liability Policy (the Policy) of Erlbeck issued by the appellee, Fireman's Fund Insurance Company (Fireman's Fund).

Phase Two of this litigation began when the appellants sued Fireman's Fund on the Policy in the Circuit Court for Baltimore City. As previously related, Fireman's Fund denied coverage upon its contention that the plane had not been "chartered with crew" by Erlbeck. The appellants secured judgments against Fireman's Fund when the lower court ruled that the appellees had waived the right to contest coverage by wrongfully refusing to defend its insured in the Phase One suits. The court entered a pre-trial summary judgment against Fireman's Fund for the policy limits.

We reversed on appeal after concluding that Fireman's Fund's prior refusal to defend did not estop it from contesting the coverage issue, and that the duty of an excess insurer to defend an insured is not triggered until the policy

limits of primary insurance have been paid over. *Fireman's Fund Ins. Co. v. Rairigh,* 59 Md.App. 305, 475 A.2d 509 (1984). We remanded the case to the trial court to determine whether the Fireman's Fund Policy provided coverage.

On remand, Phase Three of the litigation, the appellees filed a Motion for Summary Judgment asserting that the undisputed facts showed that the airplane was not "chartered with crew" and consequently there was no coverage. In granting summary judgment, the lower court analyzed the language and purpose of the insurance contract and ruled that no reasonable policyholder would have considered himself covered under the circumstances presented.

### Construing Insurance Contracts

The appellants contend that the phrase "aircraft chartered with crew" is so vague and ambiguous that the question of whether there was coverage under the policy should have been decided by a jury. To enable us to answer this question we must first review the principles applicable to the construction of an insurance contract. Recently the Court of Appeals decided *Pacific Indemnity Company v. Interstate Fire and Casualty Company,* 302 Md. 383, 488 A.2d 486 (1985) in which a few well-established principles were again considered.

In Maryland, insurance contracts are treated like any other contract; thus, we construe the instrument as a whole to determine the intention of the parties. *Aragona v. St. Paul Fire and Marine Ins. Co.,* 281 Md. 371, 378 A.2d 1346 (1977). In so doing, we "should examine the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Pacific Indemnity, supra,* 302 Md. p. 388, 488 A.2d 486. Furthermore, words in a policy should be given their ordinary and accepted meaning, the test being "what meaning a reasonably prudent layperson would attach to the term." *Id.*

The court, as it did in the case *sub judice*, may construe unambiguous insurance provisions as a matter of law. Additionally, we must be mindful that language is not ambiguous simply because it is general in nature or undefined by the policy. *Truck Ins. Exchange v. Marks Rentals, Inc.*, 288 Md. 428, 433, 418 A.2d 1187 (1980). In fact, ambiguity arises only if the language is reasonably susceptible to more than one meaning by a reasonably prudent layperson. *Id.* In the event that language is found to be ambiguous, extrinsic evidence may be admitted to determine the intention of the parties. If the extrinsic evidence clarifies the ambiguity, interpretation of the contract is a matter for the court. If the extrinsic evidence fails to clarify and the ambiguity persists, then the interpretation of the contract becomes a matter for the jury to decide. *Pacific Indemnity, supra,* 302 Md. at 389, 488 A.2d 486; *Ebert v. Millers Mut. Fire Ins. Co.*, 220 Md. 602, 610–11, 155 A.2d 484 (1959); *Della Ratta, Inc. v. American Better Community Developers, Inc.*, 38 Md.App. 119, 380 A.2d 627 (1977).

The Policy clearly states that it is not applicable "to the ownership, maintenance, operation, use, loading or unloading of any aircraft *other than aircraft chartered with crew* by or on behalf of the insured...." (Emphasis added).

The Fifth Circuit Court of Appeals has noted that technically there can be three types of charter in which a plane is provided either with or without crew. *Block v. Compagnie Nationale Air France*, 386 F.2d 323, 329 (5th Cir.1967), *cert. denied,* 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968). The first is a "barehull," "hire," or "lease," in which the owner supplies a plane to an individual who furnishes his own crew, pays his own expenses, and uses the plane as he pleases. The second is a "time charter," in which the owner provides a fully equipped plane and crew for a specified duration. The third is a "voyage charter," in which the owner supplies a fully equipped plane and crew for a predetermined trip. 386 F.2d at 329.

Although "charter" may have the varying technical meanings explicated by the Fifth Circuit in *Block,* in normal, everyday use, we believe the phrase "aircraft chartered with crew" is not ambiguous and means a transportation arrangement by which both the plane and its crew are supplied together. In support thereof, we note that Webster's New Collegiate Dictionary (ed. 1981) defines "charter" as being "a travel arrangement in which the transportation (as a bus or plane) is hired by and for one specific group of people." In Webster's New International Dictionary Unabridged (2d ed. 1934) defines "with" as a functional word used to indicate "alongside of; among; in the company of." It defines "crew" as "the body or number of workmen required to man a machine, apparatus, etc."

We hold, therefore, that a reasonably prudent layperson who contemplated obtaining an "aircraft chartered with crew" would only enter into such a transportation arrangement by which both the plane and the crew are supplied together.

Our sole remaining task is to determine whether a reasonable policyholder would consider himself covered under the circumstances as presented.

### Application of Policy Language

Even assuming that a single pilot could indeed constitute the "crew" of an aircraft, there is no evidence to suggest that Phoenix Aviation engaged Matthews as a pilot and furnished him to the other men as "crew." The appellants, however, maintain that Erlbeck, as an officer and director of Phoenix, chartered the plane "with crew," the crew being Matthews. In support of their theory they contend that Erlbeck arranged with Matthews on behalf of Phoenix that Matthews be compensated for his pilot's services by being exempted from payment of the flight-time fee.

We believe, however, that it cannot be reasonably inferred that Erlbeck was acting on behalf of Phoenix. The

facts reveal that there was no employment contract between Matthews and Phoenix, and that Matthews was not paid by Phoenix for his flight or waiting time. In fact, Rockman and Matthews' wife Diana denied that Matthews had been employed to serve as "crew" on the trip. Furthermore, it is undisputed that Matthews did not pilot the plane on the flight from Baltimore to Nassau.

The "chartered with crew" provision is a narrow exception to a broad aircraft exclusion. It affords the insured only a limited form of aircraft coverage. However, under the appellants' theory Erlbeck would have been covered whenever he invited another pilot along and relieved him from paying pro-rata share of the flying fee.[2]

We agree with Judge Caplan's finding that the appellant's theory contradicts the character and purpose of the $69.00 annual premium umbrella policy. "The premium, ordinarily, is the agreed price for assuming and carrying the risk; that is, the consideration paid an insurer for undertaking to indemnify the insured against a specified peril." 5 *Couch on Insurance* 2d § 30:1. The liability coverage on the Policy was $1 million. Yet the annual premium was less than one-ten thousandth of the coverage. Such a proportionately low premium, in our view, reflects the appellee's belief that the risk of loss under the Policy was severely limited.[3] *See Howell v. Harleysville Mutual Ins. Co.*, 305 Md. 435, 505 A.2d 109 (1986). Indeed, that belief would be in direct harmony with the very purpose of the restrictive language of the Policy which covered an insured's flight of a chartered aircraft; provided, in es-

---

**2.** Judge Caplan observed as to appellant's interpretation of the aircraft exclusion clause: "Indeed, it is only the sharpest policy-holder in search of loopholes who could consider himself covered under the circumstances."

**3.** See also *C & H Plumbing v. Employers Mut. Cas. Co.*, 264 Md. 510 (1972) at 517, 287 A.2d 238 where Judge Hammond's words of dissent in *Old Colony Ins. Co. v. Moskios*, 209 Md. 162, 117, 120 A.2d 678 (1956) were quoted with approval: "[o]ne usually gets in this life only what he pays for. Insurance coverage is no exception."

sence, that the "charter" included an aircraft together with its own qualified professional crew to fly it. We hold that the lower court properly granted summary judgment on behalf of Fireman's Fund.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.